# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville October 15, 2013

## STATE OF TENNESSEE v. RYAN ROBERT HAASE

**Appeal from the Circuit Court for Marshall County**
**No. 2011-CR-90      Robert Crigler, Judge**

_____

## No. M2012-02244-CCA-R3-CD - Filed December 20, 2013

_____

Ryan Robert Haase ("the Defendant") was convicted by a jury of one count of criminal attempt to commit first degree premeditated murder, one count of aggravated assault, and one count of domestic assault. The trial court merged the assault convictions into the attempt to commit first degree premeditated murder conviction and sentenced the Defendant as a Range II offender to forty years in confinement. In this direct appeal, the Defendant alleges errors in the admission of certain evidence; contends that the evidence is not sufficient to support his conviction of attempt to commit first degree premeditated murder; contends that the prosecutor engaged in improper argument; and argues that he should have been sentenced as a Range I offender. Upon our thorough review of the record and the applicable law, we affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment
### of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Robert Ryan Haase.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Charles Crawford, District Attorney General; and Weakley E. Barnard and Michael D. Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted in September 2011 on one count of criminal attempt to commit first degree premeditated murder, one count of domestic assault, and one count of aggravated assault, all stemming from one incident on April 11, 2011, against the Defendant's live-in girlfriend, Lindsey Charlene Arp ("the victim"). At the Defendant's jury trial conducted in July 2012, the following proof was adduced:

The victim, twenty-four years old at the time of trial, testified that, in the spring of 2011, she was working seven days a week at two jobs. She worked at Comfort Keepers in Brentwood during the week and at her father's house in Murfreesboro on the weekends. She testified that, as of the time of trial, she was no longer able to work.

In April 2011, she was living in a house on David Avenue in Lewisburg that she had purchased. Living with her were her three children. The eldest, her son, was not related to the Defendant. Her two daughters were the Defendant's. She and the Defendant had been in a relationship for about four-and-one-half years in April 2011 but were not married. The Defendant had been unemployed since approximately the spring of 2010.

The victim testified that the last time she had had a sexual relationship with the Defendant was in February 2011. On March 19, 2011, the Defendant hit her, leaving a handprint on her face. In response, she told the Defendant that he had to move out of the house by April 30, 2011. The Defendant pleaded with her to let him remain, even offering to stay in the garage. The victim testified that the Defendant also threatened her, telling her, "If I have nothing, you have nothing" and that he had "a one-way ticket to jail." The Defendant also told her that he would put her body in a wood-chipper. On March 22, 2011, the Defendant hit her again, giving her a black eye. In response, the victim told the Defendant he needed to leave the house by April 15, 2011. The Defendant hit her again on April 8, 2011. Nevertheless, the Defendant continued to ask if he could stay. The victim kept telling him no.

On Saturday, April 9 and Sunday, April 10, the Defendant moved some of his belongings out of the house. On Saturday, the victim went to work in Murfreesboro and spent the night at her father's house. On Sunday, she programmed her cell phone with a password. She also took a photograph of herself with her cell phone at about noon on Sunday, April 10. This photograph was admitted into evidence.

The victim testified that she kept a "FryDaddy" in her kitchen, which she used to cook chicken nuggets. The FryDaddy was designed to be kept full of oil and plugged into an

2

electric socket for use. The FryDaddy was equipped with a thermostat that controlled the temperature of the oil. The FryDaddy was on the kitchen counter and "ready to go" on Sunday, April 10, 2011.

The victim arrived home at about 7:00 p.m. on Sunday, April 10, 2011. The Defendant and the three children were there. She changed her clothes and played with the children for a little while. She put the children to bed at about 8:30 p.m. She then began having a conversation with the Defendant while she played music on her cell phone. She stated that the Defendant thought she was recording the conversation with her cell phone, but she was not. The Defendant asked again to stay in the house. She refused. They "had a shot of tequila together" at the Defendant's suggestion. She explained that they "did a shot to celebrate a new beginning of life." She then began taking family portraits down from the wall because she "didn't want to look at him anymore." They argued about her cell phone, and the Defendant "smacked" it out of her hand. She told the Defendant he had until that coming Friday to get out of the house. The Defendant told her, "If I have nothing, you will have nothing."

The victim went to bed at about 10:00 p.m. She fell asleep after about twenty minutes. She woke up when the Defendant came into the bedroom with her cell phone. He threw her phone into her purse and called her a "fucking bitch." The Defendant then left and closed the bedroom door. This occurred at approximately 2:00 a.m. on Monday morning, April 11, 2011. The victim testified that she did not leave her bedroom after she went to bed.

The victim continued lying in bed but did not fall back asleep. About fifteen minutes later, she heard noise at her door and saw light coming into the room. She looked to see what was happening and saw the Defendant. The Defendant threw a pot of hot liquid on her. The victim testified that the pot was her "Rachel Ray pan," which was big enough to hold six-and-a-half quarts and was larger than the FryDaddy. The pan was admitted into evidence. The victim stated that it normally was kept "[u]nder the cabinet in the kitchen."

The victim testified that, when the liquid first hit her, she thought it was boiling water. The pain was instant and "[e]xcruciating." She jumped up and ran to the kitchen for the landline telephone. The Defendant stayed in the bedroom and did not say anything to her. When she got to the kitchen, the phone was not in its place. She ran back up to her bedroom, passing the Defendant who was now in the foyer. She found her cell phone but could not get it to work. She stated that, at this point, skin was "falling off" of her and blood was "everywhere."

She ran out the front door and saw the Defendant getting in the van. He called her a bitch and drove away. She went to her neighbor's house for help. Her neighbors, the

Newberrys, took her into their house and called 911. The police and medical personnel arrived, and she was flown to Vanderbilt Hospital. She spent 126 days in intensive care. She was transferred to Skyline and was not released from hospital care until September 2011. She had thirteen surgeries and five "procedures." She was anticipating "many more." She still had open wounds that bled. She lost an ear and the vision in one eye. The victim testified that she was still on pain medication at the time of trial. Photographs taken of the victim on April 11, 2011, were admitted into evidence. Additional photographs of the victim, taken on August 24, 2011, were admitted into evidence. The victim stated that "[i]t took [her] six months and six days to actually look in the mirror for the first time."

On cross-examination, the victim acknowledged that, on March 19, 2011, the Defendant did not expressly threaten to kill her but told her, "If I can't have you, nobody is going to have you." She interpreted this to be a death threat. She also interpreted his statements that he had a "one-way ticket to jail" as death threats. She denied that the Defendant accused her of seeing other men. He did argue with her about her opening Facebook and My Space accounts. She used the accounts to reconnect with people she grew up with.

The victim maintained that the Defendant had said things to her that she took as death threats nineteen times before March 19, 2011. She acknowledged that she did not seek police protection or file a police report regarding these threats. She testified,

> I know how far to push [the Defendant]. I know what buttons to push. I know when I push a certain amount, not to mess with him.
>
> When the police – he doesn't like police. When they have anything to do with him, he – he gets very mental, I should say. He just goes ballistic.

She added that she called the police once in 2009 while she was pregnant:

> [M]e and [the Defendant] had got into an altercation, and I dialed 911.
>
> He knew the police were coming out. He settled down. And when they left, I was pregnant, and I never got beat up so bad.
>
> He – and that is how I know not to call the cops on him, because of what happened after that night when the cops were called on him. I lied to the cops and said that my son was playing with the phone.

4

After affirming that she did not tell the police officer what was going on, she added:

> I was scared to.  I was scared.  I didn't know what to expect when he got out.
>
> He had me living in fear.  And the reason I stayed for so long is because he threatened to kill me if I ever left.

She acknowledged that she and the Defendant fought "a lot."  She also acknowledged that she started some of the fights by complaining about his failure to do housework.  She acknowledged that she had "la[id] hands" on him.  Sometimes, she struck him first.

The victim agreed that her house was equipped with smoke alarms.  She heard the smoke alarm in her kitchen going off when the Defendant opened her bedroom door moments before he threw the hot liquid on her.

The victim explained that she had added a password to her cell phone while she was talking with the Defendant earlier that evening.

Tom Newberry testified that he was retired after twenty-two years in the Army.  He and his wife lived next door to the victim.  At about 2:30 a.m. on the morning of April 11, 2011, he and his wife were awakened by someone beating on their front door.  They opened the door and saw the victim.  Mr. Newberry testified about the victim's appearance:

> Well, she was in what I really might characterize as kind of a hysterical state of mind.  She had on a little tee shirt and little pair of shorts that I guess she was sleeping in.  And the front of her T-shirt was wet and had blood mixed in with it.  Her face, the right side particularly I remember, was burned quite bad from . . . [sic]
>
> But as I stepped on outside and she came up the steps, I could see that the skin on her forearm, right forearm, was hanging like a loose shirt sleeve.  Blood and body fluid was dripping off her fingers and on to the floor.

Mr. Newberry was "pretty certain" that the victim told him that "he" had poured "hot grease" on her.  Mr. Newberry told his wife to call 911, and he worried that the victim would not survive until the ambulance arrived.  He did not try to administer first aid, explaining, "I couldn't think of a thing in the world that I could do that would help her or maybe do more harm because of the conditions of her flesh."

Asked about what he had seen during his twenty-two years in the military, including time in Southeast Asia, and how it compared to the victim's condition, Mr. Newberry stated that he had never "seen anything quite come up to that."

Mr. Newberry acknowledged that he wrote a short statement about the events for the police. In his written statement, he reported that the victim had stated that "[h]e poured hot water on [her] while [she] was asleep."

On cross-examination, Mr. Newberry stated that he never observed fighting or other types of problems between the victim and the Defendant.

Peggy Newberry, Mr. Newberry's wife, testified that, when she heard beating on the front door during the early morning of April 11, 2011, she looked out the window and saw the victim. The victim was yelling, "Help me, somebody, help me." After they opened the door, she could see that the victim needed help. She asked the victim what had happened, and the victim said, "My husband threw hot boiling water on me." Mrs. Newberry called 911 and then tried to call the victim's mother at the victim's request. When the victim's mother did not answer, the victim gave her another number to call. When that number was answered, she gave the phone to the victim, who then had a conversation with the other person on the phone. Mrs. Newberry did not know the identity of this person.

Mrs. Newberry described the victim's appearance: "Well, her face was all red. And her skin on her arm was kind of hanging down like this. She was all red. Her legs were all red. Her arm was all red. She was just pitiful looking." Mrs. Newberry also observed "some blood on her." She agreed that the victim's skin looked "melted."

Officer Clyde Ragsdale of the Lewisburg Police Department ("the LPD") responded to the Newberrys' house after being told by dispatch "that a female at that residence had boiling water poured on her." He arrived at approximately 2:30 a.m., four to five minutes after hearing the call. He found the victim and the Newberrys on the front porch. He described the victim's appearance:

> I noticed that her face had been – her skin was just boiled, looked like it had been boiled off of her face, melted off of her, her skin hanging off of it. Her lip was swollen.

> Pretty much the whole front side of her body had some type of burn to it, from about her kneecaps, all of the way up her thighs, her right thigh, her arms, her skin hanging off of her arms.

6

You could tell that she was burned underneath her shirt, her neck.

. . . .

Just, the right side was the worst. It [her skin] was just hanging off. Her skin hanging off of her left hand. It looked like the skin was completely gone off of the top of her right thigh, and it was bleeding. Her face was just, and especially her neck, I remember seeing her neck was like peeled back.

He added that, in his two-and-one-half-years on the police force at that point, he had never seen anything like it.

Officer Ragsdale testified that he took photographs at the scene, including photographs of the victim. These photographs were admitted into evidence. He also testified that, while waiting for the ambulance to arrive, the victim stated, "He poured boiling water on me" and "Fuck, this hurts." She also informed him that there were three children in her home. Three to five minutes after Officer Ragsdale got to the Newberry residence, the ambulance arrived and transported the victim.

Officer Ragsdale went next door to the victim's house and entered through the front door. He found the three children, and other officers arrived to take care of them until they were picked up by family members. He saw smoke in the house and "could smell burned oil in the air." He saw two oven mitts laying on the floor near the entrance to the living room. He went into the kitchen and "saw oil all over the top of the stove and in the floor." He checked the stove and saw that it had been turned off. He saw a FryDaddy on the counter. There was "[v]ery little" oil in the FryDaddy and it was not plugged in. Photographs of the stove and the FryDaddy were admitted into evidence. A photograph of an unopened bag of chicken nuggets left on the counter was also admitted into evidence.

Officer Ragsdale went up the six steps to the bedroom and into the bedroom. In the bedroom, he saw a silver pot with orange handles laying on the floor. He testified, "There was a brown circle underneath the pot, where it looked like the oil had seeped into the carpet." He also observed "a large stain, kind of yellowish-orange in color, on the bed, towards the headboard of the bed." He saw oil on the headboard, on the pillows, and on the comforter. He stated, "there was still smoke coming off of the pillows and comforter." Photographs of the bedroom and its contents were admitted into evidence.

Officer Amanda Newcomb Binkley of the LPD also responded to the scene. En route, she received a call that the victim's "husband" had come to the sheriff's office and was "in the floor crying." She passed this information along to her sergeant who advised her that he would go to the sheriff's office. At the scene, she saw Officer Ragsdale, the Newberrys, and

the victim. She described the victim's appearance:

> She had very extensive scalding. Her face was swollen and had turned grayish-white. Her lip was swollen.

> She had – her skin – there was skin hanging off of both arms. There was big red spots on her. Her shirt was melted into her chest area.

> She had a large round red spot that was – her skin was completely gone.

Officer Binkley also testified that the victim "said several times that she was having difficulty breathing." Officer Binkley described the victim's breathing as "very shallow. It seemed like she was having a hard time breathing."

After the victim left in the ambulance, Officer Binkley went next door to check on the children. She testified, "The house was filled with smoke. . . . There was a burned smell of oil, cooking oil, that filled the house." She added that the television was "blaring" and "extremely loud." She noticed pot holders on the floor to the left of the front door. She found two sleeping children in one bedroom. She found an older child asleep in another bedroom. She woke all of the children up and determined that they were okay. When she went into the master bedroom, she observed the pot on the floor in the bedroom and the stains on the bed.

Carol Binkley, the dispatcher at the Marshall County Sheriff's Office ("the Sheriff's Office"), testified that, at approximately 2:30 a.m. on the morning of April 11, 2011, the Defendant came into the lobby. She stated, "He appeared to be upset." He walked over to her window and told her, "I just poured hot grease on my wife; oh, God." She asked him where this had occurred and for his name. The Defendant responded, and "[t]hen he got down in the floor and sat down in the floor beneath the window in dispatch." The Defendant stayed there until officers arrived. The officers spoke with the Defendant for several minutes, and then the Defendant stood up, was handcuffed, and was taken "out."

On cross-examination, Ms. Binkley stated that, while he was sitting on the floor, the Defendant appeared to be crying.

Officer Anthony McLean of the LPD responded to the Sheriff's Office. He saw the Defendant sitting on the floor in the lobby. The Defendant was crying. Officer McLean asked the Defendant what was going on, and the Defendant replied, "My life is over." Officer McLean asked for clarification, and the Defendant told him, "My wife wants a divorce; she wants to take the kids, the car." The Defendant then told Officer McLean that

8

"he goes to work and he comes home and he gives her his whole check, and he has lost his job, and now he has been declared a diabetic." The Defendant added that "she had told him he could stay a month, and then she changed it and told him he had to leave Friday." Officer McLean testified that the Defendant "made a comment that she had told him that they would never have sex again, and that she came downstairs and started rubbing on herself and said, You will never get this again." The Defendant "stated that he didn't want to hurt her, but he poured hot water on her." Officer McLean testified, "[The Defendant] said he was in the kitchen, cooking chicken nuggets, when she came downstairs." The Defendant "stated that after she came downstairs, rubbing herself, that she went back upstairs. And that is when he lost it, and he went upstairs and poured the hot water on her." The Defendant told him, "When you are in a relationship, you are supposed to make up, not break up, and the family is supposed to stay together." The Defendant told Officer McLean that, after he poured the hot liquid on the victim, he drove himself to the Sheriff's Office. After the Defendant finished his explanation, he "put his hands out and said, I am ready to go." Officer McLean handcuffed the Defendant and took him to the jail.

Deputy Matt Owens of the Sheriff's Office also responded to the Sheriff's Office. He saw Officer McLean and "a white male sitting in the floor." Deputy Owens identified the Defendant as the white male. He heard the Defendant tell Officer McLean that he had poured "chicken grease" on his wife. He also heard the Defendant say that, after he poured the grease on her, he did not check on her or come to her assistance.

Detective Scott Braden of the LPD responded to the victim's home, arriving after she had left in the ambulance. He testified, "there was blood, oil, skin, all over the house." He saw the unopened bag of chicken in the kitchen. He looked in the trash and found no evidence that any chicken had actually been cooked.

Det. Braden interviewed the Defendant with Officer Ragsdale present on April 11, 2011. Det. Braden advised the Defendant of his <u>Miranda</u> rights at 4:48 a.m., and the Defendant indicated that he understood and waived them. The Defendant appeared lucid and coherent and did not appear to be under the influence of drugs or alcohol. The Defendant told Det. Braden that he had drunk some tequila and smoked some marijuana but added that he was not feeling the effects of either. After their conversation, the Defendant agreed to make a written statement. The statement was admitted into evidence and provided as follows:

> About two weeks ago [the victim] and I got into a fight at the house. I slapped her in the side of the head and she hit me in the leg with a step ladder. Things have been bad since then. She told me that I had to April 30 to get out and then it got shorter and shorter. She told me last night that I had

9

to be out last night. This has been hard for me to digest. She has been taking all the pictures with me in it down. She would say things like "I'm going to put something else there." She has been sexually teasing me for awhile. She would touch herself and me and say I know you want it but you can't have it. Yesterday (4-10-11), [the victim] was at work and I was at the house alone. My mom had the kids and I was trying to move my stuff to my dad's place. [The victim] got home around 8:00 pm and we had a drink, a double shot of tequilla [sic]. We were having conversation and she would say things to me like she was trying to get me to incriminate myself. She was trying to record the conversation with her phone. I slapped the phone out of her hand. She went haywire on me and said I hit her. I told her no I didn't hit you, I just slapped her phone. I was begging her to give me to the 30th to get out. I told her I would even sleep in the garage. [The victim] went to bed around 10:00 pm to 11:00 pm. I went up to her bed about thirty minutes after she went to bed and layed down beside her. I layed in the bed with her for about thirty minutes and couldn't go to sleep so I went back downstairs and started watching tv. I needed something to eat so I was going to fry some chicken. I started to warm up the oil in a pan on the stove. I went to the livingroom and had a couple more shots of tequilla [sic] and was smoking a cigarette. I do[z]ed off while watching the tv waiting on the oil to warm up. I woke up and smelled the smoke and think I heard the smoke detector going off. I went into the kitchen and turned off the stove eye and cleaned some of the grease up. As I was cleaning up the mess, [the victim] came downstairs and said what are you doing. She then looked at me and said "you stupid fuck." After she called me a stupid fuck she was starting to go back upstairs and she stopped and put her hand in her panties and touched herself and said some sarcastic sexual comment about me not being able to touch her. She went on upstairs to bed and I snapped and followed her upstairs with the pot of oil. When I got to the bedroom, [the victim] was in the bed laying down. I didn't say anything to her I just flung the pot of oil at her and the bed. I was standing at the foot of the bed. I heard [the victim] yell and I immediately left the house and went to the Sheriff's Department and told the lady what I had done. I am sorry for what I have done. This statement was written for me by Det. Scott Braden and is true and correct and I approve it as my own.

The Defendant signed the statement.

Det. Braden testified that the door into the bedroom had oil on its outside surface, describing it as "oil had come out of the pan where somebody, it appeared, pushed into the door to open it and it splashed out." Det. Braden also saw oil on the stovetop and on the

floor in the kitchen. It did not appear to him that there had been any attempt to clean up the spilled oil, and Det. Braden did not find any dirty paper towels or other evidence that oil had been wiped up. Det. Braden measured the distance from the stove to the bedroom and testified that it was thirty-three feet. This distance included the six steps up to the bedroom area.

Dr. Jeffery Scott Guy of Vanderbilt University Medical Center testified that his "current practice is a limited specialty to probably about 80 percent of it is burns and surgical critical care." He added that, over the past fifteen years, he had probably treated over 10,000 burn patients. He was recognized by the trial court as an expert in "[m]edicine; general surgery; critical care surgery; trauma surgery; and acute care surgery." Dr. Guy began treating the victim shortly after she was admitted to Vanderbilt on April 11, 2011, and continued to treat her as of the time of trial as her "primary attending physician."

Dr. Guy stated that the victim had deep third-degree burns on forty-five percent of her body, "[c]overing areas of her face and neck; her extremities, arms and hands." He stated that, as a result of her extensive burns, the initial weeks of her treatment consisted of keeping her body from "try[ing] to shut down and die." He added that, without an immediate medical response to such burns, "the heart will start to pump very ineffectively; the patient will lose significant amounts of fluid; eventually go into shock; renal failure and death typically in about 48 to 72 hours with a burn this size." An estimation of the likelihood of the victim's dying from the burns was 68 percent, and he informed the victim's mother that "her odds of dying were greater than her odds of living." Dr. Guy confirmed that "being doused with boiling oil to the extent that she was" could cause death. He added, "If I had my choice as a victim I would choose either a gunshot wound or a stab wound over being burned like this."

Dr. Guy explained that oil boiled at a temperature of between four and five hundred degrees, or approximately twice the heat required to boil water. Liquid at that temperature would cause third-degree burns "immediately." Because of its increased viscosity compared to water, hot oil causes greater damage than hot water. Asked whether it would be better to be doused in gasoline and set on fire or doused with boiling oil, Dr. Guy responded, "I am going to take the gasoline every single time."

Dr. Guy described the pain associated with burns of the depth experienced by the victim as "excruciating." Another result of such burns is that the patient's immune system is severely compromised, increasing the risk of life-threatening infection. Dr. Guy added, "The biggest cause of death in burn patients is the infections, typically pneumonia."

Dr. Guy stated that, to date, the victim had undergone fifteen operations and eighteen different procedures. More would be necessary in the future. Dr. Guy testified about the

11

permanent injuries and disabilities that the victim suffered from the burns.

On cross-examination, Dr. Guy testified that "[b]oiling oil is a lethal medieval weapon that has been used since the dark ages."

Candice Hinson, the Defendant's mother, testified on behalf of the defense. She stated that, on April 10, 2011, she was watching the victim's three children while the Defendant and his father were moving the Defendant's things out of the victim's house. She took the children back home to the victim's house at about seven or seven-thirty that evening. The victim and the Defendant were both home. They were sitting on the couch in the living room with a table between them. On the table was a bottle of liquor. Ms. Hinson described the scene:

> [The victim] was ecstatically happy, like going on and on that she was just so happy that [the Defendant] was finally going to be leaving and that she couldn't believe – she never thought she would see this day.
>
> She was going on and on and on about how happy she was, that it was all going to be over and [the Defendant] was just sitting there and he looked very hurt.

Ms. Hinson left the house shortly after this encounter.

Ms. Hinson learned the next morning what had happened to the victim. She checked her phone, which she had turned off during the night, and found six messages from the police. Ms. Hinson stated that she had custody of the victim's three children while the victim was in the hospital, between seven and eight months. Custody was returned to the victim after she was released from the hospital. Ms. Hinson continued to help with the children and kept them "as often as possible."

Asked about her current relationship with the victim, Ms. Hinson responded, "I would hope we are as close as we could be or at least continuing on that path." Ms. Hinson continued to help the victim in any way she could, including driving her places and financially. They had recently talked about the crime, and Ms. Hinson testified that the victim told her "that when she [the victim] saw him [the Defendant] with the pan she thought he was boiling water on the stove."

On cross-examination, Ms. Hinson reiterated that the victim had told her that "when she saw [the Defendant] with that pot on the stove she thought he was boiling water." She again testified, "She said when she saw him with that pan on the stove she thought he was

boiling water."

The Defendant testified that he met the victim in 2006 while they were coworkers. They began a romantic relationship one to two months after meeting and began living together four to five months later. He kept full time employment until the last eight months of their relationship, during which time he was unemployed. He explained that he was one of 500 employees let go during a downsizing. He stated that the victim also was unemployed "a lot of time" during their relationship.

He and the victim had two daughters together, the older born in 2008 and the younger born in 2010. They moved into the house on David Avenue in July 2010 at about the same time he lost his job. At that point, they decided as a couple that the victim would work outside the home, and the Defendant would take care of the children at home. The victim's eldest child, her son Malachi, also lived with them. The Defendant described his relationship with Malachi as "pretty much like a father/son relationship." The Defendant's son from another relationship also stayed with them every other weekend. The Defendant stated that everyone got along. He acknowledged that he and the victim never married, explaining that they had planned to but "just never did because of financial reasons."

The Defendant testified that his relationship with the victim began deteriorating about two weeks prior to April 11, 2011. He explained, "We got into an argument about her communicating with other men on a social level, Facebook; texting other men, other men texting her. Things I had no idea about that were going on." He added that he "looked over her cell phone one evening and found out a bunch of things that was [sic] going on behind [his] back that [he] had no clue about, she did not inform [him] about them." He stated that, as a result of his review of her cell phone, he "realized possible infidelity. [He] realized that she has been lying to [him]." He questioned her about it, and she replied that she did not want to talk about it. He persisted in his questions. He testified,

> She went and tried to – she went into the bedroom, and she put a pillow over her head and was just trying to not – you know, over her ear, to not hear what I was wanting to talk about.
>
> I pulled the pillow away from her. I snatched the pillow away from her so she could at least hear what I was saying. And she kicked me in my leg.
>
> At that point, I reacted negatively, and I slapped her with an open hand on the side of her face. And I guess a couple of my fingertips proceeded around the front of her face and struck her on her eye a little bit.

13

> Then she got up and hit me with like a stepstool, a fold-up stepstool, stepladder, a two-step stepladder thing.

Later that same night, the victim told him that he had to leave the house by April 30.

While the Defendant was looking through the victim's phone, he found a photograph of a man named Adam Abby, whom he did not know. On the day after the fight just described, the Defendant went to Murfreesboro where the victim was working in order to see if he could repair a problem on the family van she had been driving. He did not tell the victim that he was coming. While he was at the house where the victim was working, he saw Abby, whom he discovered was a friend of one of the victim's stepbrothers. At one point during his visit, he noticed Abby and the victim "kind of talking in private." He added, "[w]hen they see [sic] me, they kind of scattered." He thought this was "very suspicious or odd." He did not see Abby again.

On the evening of April 10, the Defendant and the victim argued again. The Defendant testified that the victim was antagonizing him with her cell phone and he eventually "struck the phone out of her hand." She responded by telling him that he had to get out of the house "like right then."

The Defendant explained that the victim's insistence that he move out was difficult for him because it involved "[b]eing uprooted from [his] family." He added,

> Trying to figure out, in a hurry, how I was going to support myself on my own, with being unemployed.
>
> I was – I'm an insulin-dependent diabetic. I was getting my medication through [the victim's] health insurance.
>
> The food we ate was from [the victim] and her food stamps.
>
> So it was – it was a lot of issues there.

He described the victim removing photographs from the wall that had him or his son in them. She told him she was going to throw them away, and he told her he wanted to take them with him.

The Defendant also testified that the victim engaged in sexual teasing after she had told him to leave:

14

It was on more than one occasion. I didn't understand it because we were supposed to be separating and she didn't want to be with me anymore.

But at the same time, there would be times of the day where I would just be minding my own business, and she would start sexually flirting with me or making sexual advances to me and whatnot.

Asked to be more specific, the Defendant continued:

She would get out of the shower, and she wouldn't have any underwear on or bra on, and start flashing me, start showing me her private areas, asking me, do I want that. And she'd pull on her breast, out of her shirt. Or she has gotten on top of me and straddled me, like she wanted to have sex with me, until I gave in and started to go along with the foreplay, so to speak. And then as soon as I started, then she would jump up and start laughing and say, Sorry, this is not yours no [sic] more.

She thought things like that was [sic] cute. This was all during the last 10 days before this happened.

One day I was on the floor, playing with my youngest daughter. And she come [sic] up to me, and she had got out of the shower. She grabbed the back of my head and pushed my face into her crotch and asked me, how did it smell, and did I want some of that.

She would ask me, did I want to kiss her; did I still love her.

I would say, yes, I still loved you.

She would put her face close to mine and say, Well, if you love me, give me a kiss.

When I would go to proceed to give her a kiss on the cheek, she would pull her face back and start laughing and tell me, Sorry, I am not yours anymore. So things like that.

The Defendant stated that the victim was engaging in this conduct "from around April 1st to April 11th."

15

According to the Defendant, the victim was at work on April 10, 2011, and the Defendant's mother had the children. The Defendant used the day to move some of his belongings. The victim arrived back home that evening and the children arrived a short time later. The Defendant and the victim drank some tequila and were having a conversation when she told him that she had gotten the oil changed in their SUV. The Defendant thought this was odd because it was customary for either him or his father to take care of the mechanical work on the family vehicles. He went out to the SUV and looked for a receipt. He testified that he found a receipt for an oil change, but the name on the receipt was Adam Abby. When he asked the victim about it, she told him, "Don't fucking worry about it." He kept trying to ask her questions, but she ignored him. He testified, "So I put the receipt back. I kind of knew about this guy anyway. It wasn't that big of a surprise at this point."

The Defendant stated that, after they had calmed down, they went to the bedroom. They both lay down and were talking. After some time, he got up and returned to the living room to watch television. The victim stayed in bed as she had to get up early the next morning to go to work.

The Defendant decided to cook some chicken nuggets, something he had done frequently. He took the chicken out of the freezer and placed it on the counter. He explained that he decided to use the Rachel Ray pan because the FryDaddy was dirty and he "didn't feel like cleaning it out." He explained that he had used both pans to fry food in the past. To use the Rachel Ray pot, he needed to fill it with oil "[m]aybe slightly more than half full." The Defendant testified that he put the oil in the Rachel Ray pot so he "could cook the chicken nuggets" and denied that he was planning on pouring the oil on the victim.

After putting the normal amount of oil in the pot, the Defendant turned the stove on. He stated, "It always takes a little bit of time to heat that oil up before you can use it to cook," adding that it took fifteen or twenty minutes. He did not recall what time of the night it was. He returned to the living room and dozed off on the couch. The sound of the smoke alarm woke him up. He rushed into the kitchen, where there was "a lot of smoke." He "put the oven mitts on so [his] hands wouldn't get burned," and took the pot off of the stove, moving it to the countertop. In the process, he spilled some of the oil on one of his legs, burning himself. At that point, he heard "somebody laughing." The Defendant continued:

> And I looked over there, and that is when I noticed [the victim] over there on the other side of the kitchen, laughing at – she thought it was funny that I got burned and was chuckling and called me a stupid fuck.
>
> She said something else. I don't know. I think it was another sexual comment or something, something sarcastic.

16

And she proceeded back to the bedroom.

At that point, the Defendant testified,

I lost control. I had never felt quite like that before. I just think it has to do with this – my whole stress for the last couple of weeks. Under the pressure I was in, I believe I was in – not a normal – I was not in a normal state of mind.

I had been drinking that evening. I was – I had just woken up from a nap. I was half sleeping.

A combination of all of that, with – I think what really had made me snap right then was that I had got burned and hurt, and she thought that was funny.

Then she cursed me. And she is still playing her little sexual teasing games with me all at that time.

I lost all sense of control. I immediately followed her up to the room, right behind her. I opened the door. She was getting back into the bed. It was dark. I just – when I went to the door, I just flung the remaining contents of what was in that Rachel Ray pot.

And when I heard her holler out in pain, it kind of made me snap out of whatever I was – whatever had happened. And at that point, I panicked. I didn't – I realized what I had did [sic]. I didn't know what to do at that point. I was very frantic at that point.

I threw the pot on the floor. Just left – I ran out of the house. I knew that I did something I was going to be in trouble for. I knew that I needed to get her some type of help.

And I went down a couple of stairs, and I threw the oven mitts down in the living room. I went out. I got in our family van. And I tried to go tell the police to go help her and tell them what I did.

The Defendant denied that he was trying to kill the victim when he threw the oil on her. He stated, "I didn't have any particular reason or plan to do that. It's kind of something that just – just sporadically [sic] happened." He also denied calling or mouthing "Bitch" as

17

he got in the van to leave. He also denied having ever threatened to kill the victim. He denied having any idea that the oil would cause the types of injuries that the victim suffered. He did not know that the oil could have killed her. He testified, "I had no idea what kind of damage would occur."

The Defendant testified that, when he arrived at the Sheriff's office, he told the dispatcher, "Please send some help to 434 David Avenue" and told her what he had done. She told him that there was already help en route. He testified that he was "very much sorry" for having "hurt somebody really bad."

On cross-examination, the Defendant admitted that he had put about five quarts of oil in the Rachel Ray pot. When he responded to the smoke alarm, he saw that the oil in the pot was boiling. He acknowledged knowing "how bad that burns" when grease from frying bacon landed on skin. He stated that he assumed the hot oil "would burn somebody. [He] just had no idea of the severity of the burn."

Asked what he was thinking at the time he picked the pot up and turned toward the stairs, the Defendant stated that he did not know and did not remember. He added, "I don't remember nothing at all. Like I said, I kind of blanked out. When I lost control, I just – " On further questioning, the Defendant testified, "I guess I intended to hurt her. I never intended to kill her at all. I know that." He added:

> I hadn't realized what I had did [sic] until after I had thrown the oil towards [the victim], and I heard her holler out in pain.
>
> Right then is when I realized what I just did, what had happened. That is the first time I remember thinking.

When asked about having hit the victim, the Defendant testified, "I never hit her that many times."

The Defendant stated that, on the night of April 10-11, 2011, there was no oil in the FryDaddy. He added that "it seemed to be dirty, like it hadn't been washed since the last time it was used." He acknowledged that the FryDaddy would not get hot enough to boil oil. The Defendant denied telling the victim that he would put her body in a wood chipper. He denied telling the victim that he would have a one-way ticket to jail. He stated that he still loved the victim. He testified, "I never wanted [the victim] dead. I have never wished death upon her. I never intended to kill [the victim]. I have never threatened to kill her. I never wanted her dead or nothing or anything along those lines, sir."

18

The State recalled the victim in rebuttal. She denied that she made statements on April 10, 2011, in front of Ms. Hinson that she was happy that the Defendant was moving out. She clarified that she and Ms. Hinson were not present at the victim's house at the same time that evening. She also denied telling Ms. Hinson that she saw what she thought was boiling water in the Rachel Ray pot on that night.

After considering this proof, the jury found the Defendant guilty as charged. The trial court subsequently sentenced the Defendant as a Range II offender to forty years in the Tennessee Department of Correction for the criminal attempt to commit first degree premeditated murder conviction. The trial court merged the two assault convictions into the attempted first degree murder conviction. The Defendant timely filed a motion for new trial, which the trial court denied after a hearing. The Defendant perfected this appeal and now argues that the trial court erred in admitting certain evidence; contends that the evidence is not sufficient to support his conviction of criminal attempt to commit first degree premeditated murder; contends that the prosecutor engaged in improper argument; and argues that he should have been sentenced as a Range I offender. We will address each of these contentions in turn.

## Analysis

### *Admission of Irrelevant Evidence*

The State elicited testimony from Mr. Newberry that he had retired from the military in 1972 and that he had served in Southeast Asia. The State then inquired how the victim's injuries compared to what he had seen during his twenty-two years in the armed services. The defense objected on the basis of relevancy. The trial court overruled the objection, and Mr. Newberry answered, "I don't think I have ever seen anything quite come up to that." The Defendant argues that the trial court erred in allowing the State to elicit this testimony because it was not relevant.

We generally review issues regarding the admissibility of evidence under an abuse of discretion standard. State v. Looper, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (quoting State v. James, 81 S.W.3d 751, 760 (Tenn. 2002)). An abuse of discretion is made out "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)); see also Looper, 118 S.W.3d at 422.

We agree with the Defendant that the challenged testimony was not relevant and that the trial court erred in admitting it.[1] "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. How the victim's injuries compared to the injuries that Mr. Newberry may have seen while in military service had no tendency to make any fact more or less probable in the determination of whether the Defendant was guilty of attempt to commit first degree premeditated murder or either of the assault charges. While we agree with the State that the charge of aggravated assault required it to prove serious bodily injury, see Tenn. Code Ann. § 39-13-102(a)(1)(A) (2010), Mr. Newberry's testimony did not clarify the severity of the victim's injuries other than to suggest that they were worse than what he had observed while in the armed services. However, Mr. Newberry did not testify that he had served in active combat, nor did he testify about what, if any, injuries he actually saw while in the military. Given that Mr. Newberry did not testify about any other injuries he had actually observed, he did not testify about how the victim's injuries actually compared to other actual injuries. Thus, the jury was left to speculate. We hold that the trial court erred in admitting this testimony.

The Defendant also objected on the grounds of relevance during Officer Ragsdale's testimony. After Officer Ragsdale described in detail the injuries to the victim that he observed while in her presence before the ambulance arrived, the State asked whether he had "[e]ver seen anything like that before" during his two and one-half years on the police force. The defense objected, and the trial court overruled the objection. Officer Ragsdale responded, "[n]o." Officer Ragsdale did not testify about any other injuries he had actually observed, nor did he testify about how the victim's injuries actually compared to any other injuries he had actually seen.

Again, we agree with the Defendant that the trial court erred in allowing this specific question and answer. How the victim's injuries compared to other injuries that Officer Ragsdale may have seen while a police officer, about which he offered no testimony, was simply irrelevant to the jury's deliberations.

Nevertheless, the Defendant is entitled to no relief on the basis of these errors "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); see also State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008). We hold that this very limited erroneously admitted testimony had no effect on the jury's verdict. The extent

---

[1] We, however, express no opinion as to whether this testimony may have been relevant at the Defendant's sentencing hearing.

of the victim's injuries was described to the jury by the victim and other eyewitnesses, including the victim's primary treating physician, as well as through many photographs. Moreover, the victim's presence provided the jury an opportunity to view for itself the result of the injuries inflicted by the Defendant. We are confident that the testimony by a retired serviceman and a relatively inexperienced police officer that they had not witnessed other, equally severe injuries in their professional lives did not impact the jury's decision-making, given the presence of this other admissible evidence. Accordingly, the Defendant is not entitled to relief on this basis.

*Admission of Cumulative Evidence*

The defense objected to Mrs. Newberry's testimony about the victim's injuries as cumulative. The defense lodged a similar objection to Officer Binkley's testimony about the victim's injuries.[2] The trial court overruled both objections. The Defendant contends that the trial court's rulings were erroneous.

Our Rules of Evidence provide that relevant evidence "may be excluded if its probative value is substantially outweighed . . . by considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403. As set forth above, we review a trial court's decision to admit evidence for an abuse of discretion.

The Defendant argues that the State was seeking to improperly stir the jury's emotions by eliciting numerous eyewitness descriptions of the victim's injuries and that Mrs. Newberry's and Officer Binkley's descriptions were "needlessly cumulative" and "served no legitimate purpose." The State responds that these witnesses' testimony "was not entirely cumulative because both women testified regarding details that were not presented by Mr. Newberry's or Officer Ragsdale's testimony." The State also asserts that this testimony assisted it in proving that the Defendant caused the victim to suffer serious bodily injury as required to convict him of the charge of aggravated assault. See Tenn. Code Ann. §§ 39-13-102(a)(1)(A); 39-11-106(a)(34) (2010).

As set forth above, a trial court may exclude relevant evidence if its probative value is "*substantially outweighed* . . . by considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403 (emphasis added). While we agree with the Defendant that there was considerable overlap in the various witnesses' descriptions of the victim's injuries, we disagree that the somewhat cumulative nature of this proof substantially outweighed the

---

[2] The record reflects that the officer's full name was Amanda Newcomb Binkley. Although the Defendant refers to her as "Officer Newcomb" in his brief, she testified that she went by the name Amanda Binkley.

21

probative value of this evidence. Again, the State was required to prove that the victim suffered serious bodily injury. The State was entitled to put on sufficient proof to establish this element of the crimes with which the Defendant was charged. We hold that the trial court did not abuse its discretion in admitting Mrs. Newberry's and Officer Binkley's testimony about their direct observations of the victim's injuries.[3] Accordingly, the Defendant is not entitled to relief on this basis.

*Sufficiency of the Evidence*

The Defendant contends that the evidence was not sufficient to support his conviction of criminal attempt to commit first degree premeditated murder. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or

---

[3] We note that the testimony at issue here simply involved the witnesses' direct observations as opposed to the comparative testimony determined to be inadmissible above.

substitute its own inferences for those drawn by the jury.  State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

First degree premeditated murder is defined as the "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1) (2010).  A premeditated killing is one

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).  Premeditation is a question of fact for the jury to determine after considering all of the proof.  State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003).

Our criminal code further provides as follows regarding criminal attempt:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

> (b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

23

Id. § 39-12-101 (2010).[4]

The Defendant contends that the proof was not sufficient to prove that he intended to kill the victim or that he threw the oil on her in a premeditated attempt to kill her. His argument rests on the testimony he gave at trial, in which he stated that the victim provoked him into "snapping" and "losing it," causing him to convert his dinner preparations into a weapon for inflicting harm but not death. However, the victim's testimony provided the jury with a very different account of what transpired. According to the victim, whom the jury obviously accredited over the Defendant, she had gone to bed after having an argument with the Defendant over her cell phone. Several hours later, she awoke when the Defendant came into her bedroom, threw her cell phone down, and called her a "fucking bitch." The Defendant then left the bedroom, and she remained in bed. About fifteen minutes later, the Defendant returned with the pot of boiling oil and threw it on her. He then left the house without attempting to render any aid.

---

[4] The count charging the Defendant with attempted premeditated murder alleged that he

acted with intent to complete a course of action or cause a result that would have constituted the offense of the First Degree Murder of [the victim] under the circumstances surrounding the conduct as the said [Defendant] believed them to be, and the conduct constituted a substantial step toward the commission of the offense of the First Degree Murder of [the victim] . . . .

The trial court instructed the jury as follows:

Any person who attempts to commit a criminal offense is guilty of a crime.

For you to find a person guilty of Attempted First Degree Murder, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant intended to commit the specific offense of First Degree Murder of Lindsey Charlene Arp; and

(2) that the defendant did some act intending to complete a course of action or cause a result that would constitute First Degree Murder under the circumstances, as the defendant believed them to be at the time, and his actions constituted a substantial step toward the commission of First Degree Murder. The defendant's actions do not constitute a substantial step unless the defendant's entire course of action clearly shows his intent to commit First Degree Murder.

The trial court then instructed the jury on the elements of first degree premeditated murder. The Defendant has raised no issue contesting these instructions.

24

Because premeditation requires insight into the defendant's state of mind, a jury may infer the defendant's mental state based on his actions and the surrounding facts and circumstances of the attempted killing. See State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005). Thus, "[a]lthough a jury may not engage in speculation," id., circumstances that may indicate premeditation include the use of a deadly weapon upon an unarmed victim; lack of provocation by the victim; the accused's declarations of an intent to kill; the accused's failure to render aid to the victim; facts indicative that the accused had a motive to kill the victim; and the particular cruelty of the (attempted) killing. See State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Viewing the evidence in the light most favorable to the State, the proof established that the Defendant previously had threatened the victim's life; that the Defendant was jealous and possessive of the victim; that he was angry at being ejected from the victim's home and life and worried about how he would cope without her money, insurance, and food stamps; that, hours after the victim went to bed, he brought a large pot of oil to boiling; that, had he intended only to cook chicken, he could have used the FryDaddy, which heated the oil to a far lower temperature; that he put on oven mitts to handle the pot of oil, indicating that he knew how hot and dangerous the oil was; that he walked the pot of boiling oil thirty-three feet from the kitchen to the bedroom; and that he flung the oil on the victim while she lay, unarmed, in bed. The Defendant then left the house without rendering aid. This is more than enough circumstantial proof to establish that the Defendant acted intentionally and with premeditation and that his goal was to kill the victim.

The Defendant claims that he did not know that the boiling oil could kill the victim. However, as pointed out by Dr. Guy, "[b]oiling oil is a lethal medieval weapon that has been used since the dark ages." The jury clearly rejected the Defendant's claim of ignorance and clearly rejected the Defendant's claim that he knew only that his actions could harm, but not kill, the victim. Based upon the evidence heard by the jury, the jury was entitled to draw this conclusion.

We hold that the proof was sufficient to support the Defendant's conviction of criminal attempt to commit first degree premeditated murder. Accordingly, the Defendant is entitled to no relief on this basis.

*State's Closing Argument*

The Defendant contends that he is entitled to a new trial because the prosecutor made improper comments during closing arguments. During the initial closing argument, the prosecutor made the following statements:

In each of the three counts, there are lesser-included offenses.

Now, it gets real harried when a brand-new jury, which is not what you all are, are first told about the lesser-included offenses. A lot of the jurors say, well, the Judge is trying to tell us he doesn't think he ought to be convicted of the charged count, and that is why he is giving us the lesser-includeds.

No. Like I told you in jury selection, you have got a boss. I have got a multitude of bosses. And the judge has a boss. His is an elected official.

But his bosses are the judges on the appellate level court, that goes all of the way from the appellate court here in Tennessee, the Supreme Court here in Tennessee, the federal court, and the State Supreme Court.

The defense objected on the basis that the prosecutor's argument improperly suggested that the jury ignore the lesser-included offenses because they were included only because the trial judge's "bosses" required them to be included in the jury charge. The trial court overruled the objection, and the prosecutor resumed, stating, "The appellate level courts and the law in Tennessee require the Judge to charge lesser-included offenses. The Judge is not allowed to comment on the evidence, so do not take the fact that you receive lesser-included offenses as some comment the Judge is making." The Defendant now contends that the trial court's ruling on his objection was reversible error, asserting that

[a]llowing the prosecution to argue in this manner to the jury improperly undermined the significance of the lesser-included offenses and allowed an incorrect inference to be drawn – that the lesser-included offenses were of no consequence and should not be considered, because the only reason they were included was that the trial judge's boss forced the judge to include them.

Later in closing argument, the prosecutor commented that "[w]hat was done to [the victim] was worse than murder." The defense objected that the comment was an improper personal opinion and moved for a mistrial. The trial court cautioned the prosecutor, "you can't express your personal opinion. It is outside of the record. Conform yourself to that." The trial court denied the Defendant's request for a mistrial, a ruling the Defendant now argues was erroneous.

Although trial courts possess substantial discretion in determining the propriety of closing arguments, they must restrict improper argument. State v. Hill, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citing Sparks v. State, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). In making their closing arguments, both parties must be temperate and must

predicate their arguments on evidence adduced at the trial. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Additionally, summations "must be pertinent to the issues being tried." Id. (internal quotation marks omitted). Prosecutors, particularly, must proceed with caution due to their special role in the criminal justice system. See Hill, 333 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id.

This Court previously has recognized five general areas of prosecutorial misconduct during closing argument:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)) (citations omitted).

However, even if the record demonstrates prosecutorial misconduct during closing arguments, this Court will not grant a new trial on this basis unless it is "so inflammatory or improper as to affect the verdict." Hill, 333 S.W.3d at 131 (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). In determining whether the State's argument improperly prejudiced the defendant and affected the verdict to the defendant's detriment, this Court considers the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Scarborough, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009).

As to the first of the contested remarks made by the prosecutor in this case, the State concedes in its brief that "the prosecutor's comments may not have been artfully worded – particularly the use of the term 'bosses' to describe members of the appellate courts." We agree. We also agree with the Defendant that the prosecutor engaged in misconduct when he told the jury that what the Defendant did to the victim "was worse than murder." However, we disagree that either challenged aspect of the State's closing argument was so improper as to entitle the Defendant to a new trial.

Turning to the Judge factors, the facts and circumstances of this case strongly favored the prosecution. As indicated above, the only contested issue in this case was the Defendant's state of mind at the time he threw the hot oil on the victim. The prosecution and the defense presented the jury with two very different scenarios from which to choose, and the success of either side depended upon the jury's assessment of the victim's and the Defendant's credibility. Clearly, the jury determined that the victim's testimony was more credible than the Defendant's. The victim's testimony was more than sufficient to establish that the Defendant acted with premeditation and with the intent to kill her when he threw at least five quarts of boiling oil on her while she lay, defenseless, in bed.

Turning to the next factor, the trial court overruled the Defendant's objection to the prosecution's argument about lesser-included offenses. Accordingly, no specific curative measures were taken at that point. However, the trial court properly instructed the jury on all of the lesser-included offenses required under the proof of this case. The trial court also properly instructed the jury that it was not to consider *any* lesser-included offense unless and until it determined, unanimously, to acquit the Defendant of the charge of criminal attempt to commit first degree premeditated murder. See State v. Davis, 266 S.W.3d 896, 905-08

(Tenn. 2008); Tenn. R. Crim. P. 31(d)(2). The trial court also explained to the jury that closing arguments were not evidence. We presume that the jury followed its instructions. See State v. Jordan, 325 S.W.3d 1, 66 (Tenn. 2010).

As to the prosecutor's later comment that the Defendant's crime was worse than murder, the trial court impliedly sustained the objection and cautioned the prosecutor as set forth above. The prosecutor then continued, "This case, ladies and gentlemen, is about attempted first-degree murder, period," and began to argue about the Defendant's testimony and credibility.

The third Judge factor examines the intent of the prosecutor in making the allegedly improper argument. As to the first of the contested remarks made by the prosecutor in this case, it is clear that the prosecutor was attempting to clarify for the jury that the trial court's instructions on lesser-included offenses were not an implied comment on the evidence but, instead, were required to be given. As to the comment regarding the severity of the victim's injuries, however, this was not a contested issue in this case. We agree with the Defendant that the prosecutor's comment on this issue served the purpose of attempting to inflame the jury's emotions, an inappropriate use of closing argument. See Goltz, 111 S.W.3d at 6.

The fourth Judge factor examines the cumulative effect of improper argument and other errors. We have held that the trial court erred in allowing Mr. Newberry and Officer Ragsdale to testify about how the victim's injuries compared to other injuries they had seen in their careers. Nevertheless, this error was minor when considered in the context of the rest of the State's proof. This evidentiary error added little to the impact of the improper argument under consideration. Thus, this factor does not support a finding that this improper argument affected the jury's verdict.

The relative strength or weakness of the case is the final Judge factor. As already indicated, the State's case against the Defendant was strong. The victim testified about the Defendant's previous threats and physical abuse. The Defendant himself admitted to (1) choosing a pot instead of the temperature-regulated FryDaddy in which to heat the oil; (2) heating the oil to the point of boiling; (3) donning oven mitts to pick up the pot because he did not want to get burned; and (4) carrying the pot over thirty feet to the victim's bedroom. Once in the bedroom, he deliberately threw the pot of boiling oil on the victim as she lay helplessly in bed. The Defendant, by his own admission, then left the house and the screaming victim without rendering any aid or attempting to summon medical help. The Defendant's defense was two-pronged: (1) the victim provoked him such that he snapped and did not act with premeditation, and (2) he did not intend to kill her and did not know that five quarts of boiling oil could cause death. That is, the Defendant did not take issue with the State's proof about the victim's injuries, but rather defended on the basis that he did not

29

act with the requisite culpable mental state.

While the defense focused on convincing the jury that the Defendant committed some lesser crime than criminal attempt to commit first degree premeditated murder, the proof was more than enough to allow the jury to reject the Defendant's theory. We hold that the State's improper closing argument simply was not so significant as to entitle the Defendant to a new trial. Accordingly, the Defendant is not entitled to relief on this basis.

*Sentencing*

In his final issue, the Defendant contends that the trial court erred in sentencing him as a Range II offender and that, consequently, his sentence is excessive. The State disagrees.

A convicted criminal defendant's offender classification is determined on the basis of his or her prior convictions. See Tenn. Code Ann. §§ 40-35-105, -106, -107, -108 (2010). A prior conviction is statutorily defined as "a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced." Id. § 40-35-106(b)(1). "All prior felony convictions, including those occurring prior to November 1, 1989, are included." Id. § 40-35-106(b)(2). Moreover,

> Prior convictions include convictions under the laws of any other state, government or country that, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

Tenn. Code Ann. § 40-35-106(b)(5). "The appropriate analysis of prior convictions is under Tennessee law as it existed at the time of the out-of-state conviction." State v. Brooks, 968 S.W.2d 312, 313-14 (Tenn. Crim. App. 1997). For the purposes of offender classification, prior convictions must be proved "beyond a reasonable doubt." Tenn. Code Ann. § 40-35-106(c); see also Yates v. Parker, 371 S.W.3d 152, 156 (Tenn. Crim. App. 2012).

A Range II offender is one "who has received . . . [a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable[.]" Tenn. Code Ann. § 40-35-106(a)(1). Criminal attempt to commit first degree premeditated murder is a Class A felony. See id. § 39-11-117(a)(2) (2010). Thus, the trial court properly classified the Defendant as a Range II offender if the State proved beyond a reasonable doubt that he had two prior Class A, B, or C felonies.

At the sentencing hearing, the State introduced into evidence proof of three prior convictions that the Defendant had received in Michigan. The State conceded that one of these convictions did not affect the Defendant's offender classification. One of the remaining convictions was for second degree home invasion, a conviction which the trial court found correlated to an aggravated burglary in Tennessee, a Class C felony. See Tenn. Code Ann. § 39-14-403(b) (2010). The Defendant does not contest that this conviction qualified as a prior conviction for purposes of determining his offender classification.

The remaining Michigan conviction was for delivering less than 50 grams of a mixture containing cocaine, committed in September 1996. The relevant Michigan statute provided that "a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance . . ." Mich. Comp. Laws § 333.7401(1) (Supp. 1996). The statute further provided for a penalty of "not less than 1 year nor more than 20 years" when "any mixture containing" the controlled substance "is in an amount less than 50 grams." Id. § 333.7401(2)(a)(iv). Cocaine is one of the referenced controlled substances. See id. § 333.7214(a)(iv) (1992).

The State argued at the sentencing hearing, and the trial court agreed, that the Defendant's conviction of violating this Michigan statute was the equivalent of violating Tennessee Code Annotated section 39-17-417, which made it an offense "for a defendant to knowingly . . . [d]eliver a controlled substance." Tenn. Code Ann. § 39-17-417(a)(2) (Supp. 1996). Under this statute, the delivery of less than .5 grams of cocaine was a Class C felony. See id. § 39-17-417(c)(2). The Defendant argued that the State failed to establish that the Michigan conviction was anything more than the equivalent to Tennessee's misdemeanor offense of "casual exchange." See id. § 39-17-418(a), (c) (Supp. 1996).

We reiterate that the relevant statutory language provides that, "[i]n the event that a felony from a jurisdiction other than Tennessee is *not a named felony in this state*, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given." Tenn. Code Ann. § 40-35-106(b)(5) (emphasis added). The clear implication is that, if the felony from the other jurisdiction *is* a "named felony" in Tennessee, then the elements of the offense need not be used to determine the offense's classification as a felony or a misdemeanor in Tennessee.

The proof admitted at the sentencing hearing established, beyond a reasonable doubt, that the Defendant pleaded guilty in Michigan to the "deliver[y] [of] less than 50 grams of a mixture containing the controlled substance, cocaine," identified in the charging instrument as the "felony" of "delivery of a controlled substance." We hold that this Michigan offense is a "named felony" in Tennessee, to wit, delivery of cocaine. See Tenn. Code Ann. § 39-17-417(a)(2), (c) (Supp. 1996).

31

As to the Defendant's argument that this conviction equated solely to a misdemeanor casual exchange offense, we note that our research reveals no indication that, in 1996, Michigan had a misdemeanor offense that was equivalent to Tennessee's 1996 misdemeanor casual exchange offense, committed when a person "knowingly possess[ed] or casually exchange[d] a controlled substance . . . ." Id. § 39-17-418(a), (c) (Supp. 1996). In State v. Copeland, this Court explained that "[a] 'casual exchange' contemplates a spontaneous passing of a small amount of drugs, for instance, at a party. Money may or may not be involved." 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). Because we have determined that the Defendant's Michigan offense was a "named felony" in Tennessee, we need not examine the individual elements of the Michigan offense.[5] Our determination that the offense in Michigan was a "named felony" in Tennessee pretermits this issue.

The trial court determined that the Michigan offense corresponded to a Class C felony in Tennessee, the lowest felony classification available for the felony delivery of cocaine. See Tenn. Code Ann. § 39-17-417(c)(2) (Supp. 1996). We affirm this determination by the trial court. Accordingly, the trial court correctly sentenced the Defendant as a Range II offender. The Defendant is entitled to no relief on this basis.

## Conclusion

For the reasons set forth above, we affirm the trial court's judgment.


_____
JEFFREY S. BIVINS, JUDGE

---

[5] We recognize such an examination might present a closer question on this issue.